UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------X
ANDRE BERRY,

        Plaintiff,

  - against -

EMPIRE HOMES SERVICES LLC; JOEL
GLANTZ, in his individual and
official capacity; STEVE
SILVERS, in his individual and
official capacity; MAC BAKER,
in his individual and official
capacity; TEALE SMITH, in his
individual and official
capacity; BRENT COUNTRYMAN, in
his individual and official
capacity; RICK GREENE, in his
individual and official
capacity,

        Defendants.

----------------------------X

<u>MEMORANDUM AND ORDER</u>

Civil Action No.
CV-06-2354 (DGT)

Trager, J.:

    Plaintiff Andre Berry ("plaintiff" or "Berry"") brings this
action against his former employer Empire Homes Services LLC
("Empire") and Empire employees Joel Glantz ("Glantz"), Steve
Silvers ("Silvers"), Mac Baker ("Baker"), Teale Smith ("Smith"),
Brent Countryman ("Countryman") and Rick Greene ("Greene")
(collectively "defendants").  Plaintiff alleges that defendants
discriminated against him on the basis of his race, color and
national origin and terminated his employment in retaliation for

1

his complaints of discrimination.[1]  Plaintiff's claims are

brought pursuant to Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. §§ 2000e-1 et seq. ("Title VII"), 42 U.S.C. §

1981 ("Section 1981") and the New York State Human Rights Law,

New York Executive Law, §§ 296("NYSHRL").  Plaintiff also brings

claims for breach of contract and intentional infliction of

emotional distress.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure,

defendants collectively move for summary judgment.  Defendant

Baker also moves individually for summary judgment.  For the

reasons stated below, the motions for summary judgment are

granted on plaintiff's federal law claims and plaintiff's state

law claims are dismissed without prejudice.[2]

---

[1] It is unclear whether plaintiff also alleges that
defendants discriminated against him on the basis of his age.
Although plaintiff makes a brief reference to age discrimination
in his opposition brief, he fails to include this claim in the
amended complaint.  Regardless, under the Age Discrimination in
Employment Act ("ADEA"), protection is provided only to
individuals over forty years old.  See 29 U.S.C. § 631.
Plaintiff's date of birth is June 27, 1970, see Defs.' Ex. N.,
and thus, at the time of the alleged discrimination, which
plaintiff claims took place from 2002-2004, he was not over
forty.

[2] Defendants' answer to plaintiff's complaint asserted state
law counterclaims against plaintiff for unjust enrichment,
conversion and fraud.  However, none of the parties have moved on
these counterclaims, and defendants did not address these claims
in their papers.  It appears therefore that defendants have
abandoned their counterclaims.  At any rate, defendants' state
law claims, like plaintiff's state law claims, are being
dismissed without prejudice.

## Background

### (1)

### Overview of Plaintiff's Employment at Empire

Plaintiff, a 39 year old African-American male, was hired in January 2002 by Empire, a national home furnishings company, to work as the Assistant General Manager of the Syosset, New York office.  Declaration of Andre Berry ("Pl.'s Decl.") at ¶ 1-2. The Assistant Manager position was unique to Empire's New York office and was created specifically for plaintiff in response to the substantial size of the New York-New Jersey market.  Pl.'s Ex. K. at ¶ 10.  Glantz, Senior Vice President at Empire and plaintiff's direct supervisor, interviewed and hired plaintiff for the position.  Dep. of Andre Berry ("Berry Dep.") at 191:18-21; 219-220:24-25, 2-3.  At the time of plaintiff's hiring, Glantz was aware of Berry's race.  Id.

On May 27, 2002, plaintiff was promoted to General Manager. Pl.'s Decl. at ¶ 4.  Both Glantz and Silvers, also a senior vice president at Empire, were responsible for approving plaintiff's promotion to General Manager in May 2002 and were aware of Berry's race at that time.  Id. at 219:16-20; 220:4-6.  In January 2004, plaintiff received a wage increase based on his performance evaluation.  Defs.' Exs. G and J.  On August 18, 2004,

plaintiff's employment at Empire was terminated by Glantz. Pl.'s Decl. at ¶ 4, 83.


### (2)

### Alleged Discrimination During Plaintiff's Employment

**a. Comments and Behavior By Baker**

**i.   The Alleged "Token Black" Comment**

According to plaintiff, at his first General Manager's meeting in Chicago in January 2002, defendant Baker, an Empire Sales Trainer, asked plaintiff if he was Empire's "token black." Pl.'s Decl. at ¶ 9.  Plaintiff claims that Baker made this statement in the presence of defendant Smith, Operations Manager at Empire, and 12 other general managers.  Pl.'s Decl at ¶ 10. Baker denies that he made this comment.  Def. Baker's Statement Pursuant to Local Rule 56.1 ("Def. Baker's 56.1") at ¶ 13.

Immediately after the alleged comment, plaintiff complained to Smith, who, according to plaintiff, failed to take any action against Baker.  Pl.'s Decl at ¶ 10-11, 13.  The day after the meeting, plaintiff complained about Baker's comment to Kim Nichols in Empire's Human Resources Department.  Berry Dep. at 15:5.  Approximately a week or two later, plaintiff e-mailed Glantz, Silvers and Smith regarding the comment and was assured by them that they would speak to Baker.  Pl.'s Decl. at ¶ 11-15.

A few months after the alleged comment, Baker was promoted from Sales Trainer to National Sales Manager. Pl.'s Decl. at ¶ 16. Plaintiff's promotion to General Manager of the New York office followed soon thereafter in May 2002. Berry Dep. at 195:2-5.

### ii. Baker's Alleged Sales Intructions to Plaintiff's Staff

In approximately December 2002, in his new position as National Sales Manager, Baker visited plaintiff's office while plaintiff was not present. Pl.'s Decl. at ¶ 17-18. According to plaintiff, Baker contradicted plaintiff's directions to the Empire sales managers in the New York office[3] and instructed them to refrain from sales in certain areas of Brooklyn, Bronx and Queens (specifically African-American and Hispanic neighborhoods). Id. at ¶ 20. Plaintiff alleges that Baker did this in response to plaintiff's race and color and in retaliation for plaintiff's earlier complaint against Baker regarding the "token black" comment. Id. at ¶ 26.

Baker, however, contends that his sales changes were made for legitimate business-related reasons and that he never instructed the sales managers to avoid any neighborhoods. Def. Baker's 56.1 at ¶ 15-19. He points to the fact that a few

---

[3] Plaintiff claims that Baker instructed the sales managers not to work full days and encouraged them to spend more time on the road rather than in the office. Pl.'s Compl. at ¶ 41-42.

months earlier, on August 10, 2002, he sent an e-mail to the salespeople encouraging them to show more persistence in closing sales in inner city neighborhoods.  Defs.' Ex. H; Def. Baker's Mem. of Law in Supp. of Summ. J. at 3.

### iii. The "F--king the Office Manager" Comment

During Baker's same visit to the New York office, plaintiff claims that Baker told plaintiff's staff that plaintiff was "f--king the office manager," Rachel Mott ("Mott").  Berry Dep. at 18:18-20.  Although Baker does not deny that he commented about plaintiff's alleged affair with Mott, Baker claims that he merely repeated what the sales managers in plaintiff's office had already told him regarding the relationship.[4]  Def. Baker's 56.1 at  ¶ 23.  Baker later reported to Glantz the allegations of a relationship between plaintiff and Mott.  Id. at  ¶ 23-24. Plaintiff denies that he was having an affair with Mott.  Berry Dep. at 179:22-24.

The day after Baker's comment to plaintiff's staff regarding plaintiff's alleged affair, plaintiff complained via phone and e-mail to Glantz and Silvers, and at plaintiff's insistence, a conference call was held with Glantz, Silvers, Baker and plaintiff.  Pl.'s Decl. at ¶ 29-30.  Although Baker apologized

---

[4] Although Baker admits that he commented on the alleged affair, it is unclear exactly what he said and what words he used.  Def. Baker's 56.1 at  ¶ 23-24.

for the affair comment, plaintiff claims that Glantz and Silvers
failed to address both Baker's alleged instructions to the sales
managers to avoid sales in African-American and Hispanic
neighborhoods and his alleged attempts to undermine plaintiff's
general sales directives to his staff. Id. at ¶ 30-31.[5]

### iv. The Comment at the General Manager's Dinner

According to an e-mail from Jennifer Brethour Martinez
("Brethour Martinez"),[6] manager of Empire's Human Resources
department, to Michelle Canada ("Canada"), another employee in
Human Resources, Baker made a comment during a General Manager's
dinner regarding the black neighborhoods where Empire sold their
goods.[7] Pl.'s Ex. B.  Although Brethour Martinez did not hear
the comment, she stated in her e-mail to Canada that she
"believe[d] [the comment] was referencing some of the black

---

[5] Plaintiff claims that he complained on multiple occasions
to Glantz and Silvers about Baker's behavior but they did not
take any disciplinary action against him.  Pl.'s Decl. at ¶ 11,
14-16.  Plaintiff also claims that from January 1, 2004 through
March 31, 2004, Glantz and Silvers bypassed him and spoke
directly to salespeople, thereby undermining his authority.  Id.
at 217:18-24.

[6] While employed at Empire, Brethour Martinez used the last
name "Brethour."   Brethour Martinez Aff. ¶ 1. She now uses
"Martinez."  For purposes of this opinion, she will be referred
to as "Brethour Martinez."

[7] It is unclear from Brethour Martinez's e-mail when this
incident occurred since she does not provide a date in the
e-mail.  The e-mail was not sent until August 26, 2004, which was
already after plaintiff's termination.

areas." Id. Plaintiff was in attendance at this dinner, and in response to Baker's comment, said to Brethour Martinez, "You got that HR, you know I am documenting." Id. Following the dinner, Brethour Martinez told Baker "that he cannot have these conversations . . . especially in front of [plaintiff]." Id.

**b. Countryman and Greene**

**i. The Hiring of Countryman and Greene**

Defendants Countryman and Greene began working as Empire sales managers in the New York area in 2003.[8] Pl.'s Decl. at ¶ 36. According to plaintiff, although Empire's practice was for general managers to participate in the hiring of sales managers in their region, Glantz, Silvers and Baker did not include plaintiff in the hiring of Countryman and Greene. Berry Dep. at 209:13-18; Pl.'s Decl. at ¶ 40, 42-43. Plaintiff further states that other general managers at Empire customarily participated in the hiring of sales managers. Pl.'s Decl. at ¶ 37. Specifically, plaintiff notes that he witnessed Brad Freiss ("Freiss"), another general manager, who is white, participate in the process of hiring sales managers, Id. at ¶ 39, and that other general managers in the region told plaintiff that it was

---

[8] The exact chronology of the hiring of Countryman and Greene and their subsequent behavior is somewhat inconsistent and unclear from plaintiff's evidence. However, it appears that they were hired in early 2003 and that their alleged misconduct occurred towards mid to late 2003.

Empire's practice to allow general managers to participate in the hiring process. Id. at ¶ 38. Additionally, plaintiff himself had previously been involved in the hiring of Tom Patrickquin, a sales manager for the region. Id. However, according to Glantz, senior management maintained the ultimate authority in hiring sales managers, and general managers did not have exclusive interviewing capability. Pl.'s Ex. F.

### ii. Countryman and Greene's Alleged Behavior and Plaintiff's Attempts to Discipline Them

According to plaintiff, because of his limited input in their hiring, Greene and Countryman did not respect him as the manager. Berry Dep. at 211:18-22. Plaintiff claims that both Greene and Countryman made comments that they did not report to plaintiff but instead to Baker. Id. at 211:23-25.

On May 14, 2003, plaintiff filed an "Employee Notice Warning" form, detailing a May 13, 2003 incident[9] in which Countryman referred to Joe Billi, a white Italian American Empire employee, as a "f--king melanza," while on speaker phone in the Empire office.[10] Defs. Ex. DD; Berry Dep. at 24:17-21.

_____

[9] Again, the exact chronology here in unclear. In his complaint, plaintiff claims that this incident occurred around January 2003. However, the form filed by plaintiff, which detailed the incident, states that it occurred on May 13, 2003.

[10] In his deposition, plaintiff made no mention of the word "melanza" and instead stated that Countryman used the word

Plaintiff claims that this comment was a racial slur and that he complained to Empire's Human Resources Department but was prohibited from disciplining Countryman. Berry Dep. at 25:3-4; Pl.'s Counter Statement Pursuant to Local Rule 56.1 ("Pl.'s 56.1") at ¶ 16. Countryman was transferred shortly after this incident. Pl.'s Compl. at ¶ 78; Defs.' Statement Pursuant to Local Rule 56.1 ("Defs.' 56.1") at ¶ 22.

Plaintiff also contends that when a female employee complained to him that Greene had fondled her, he referred the matter to Brethour Martinez, who told him that the company would take care of it. Berry Dep. at 213:4-23. From April 10, 2004 through August 18, 2004, plaintiff claims that he was not allowed to reprimand Greene. Id. at 224:11-14.


## (3)

### Plaintiff's Alleged Misconduct and Poor Performance

Over the course of plaintiff's employment, defendants claim that plaintiff was involved in numerous incidents that raised questions about his overall conduct.

Defendants allege that in February and April 2004, plaintiff forced Frank Tartucci ("Tartucci"), an Empire installer, to loan

---

"moolinyan." Berry Dep. at 24:17-18. Similarly, in his declaration, plaintiff stated that Countryman used the word "mulligan" and made no mention of the word "melanza" (or "moolinyan"). Pl.'s Decl. at ¶ 55.

him a substantial amount of money. Defs.' 56.1 at ¶ 59; Defs.'
Exs. U and X. Although plaintiff denies that any loans existed,
Tartucci gave Empire a handwritten statement dated August 18,
2004, stating that plaintiff took two $30,000 loans from him.[11]
Pl.'s Statement of Disputed Facts ¶ 61; Defs.' Exs. U and X.
Additionally, Brethour Martinez sent an e-mail to Glantz, Silvers
and Canada on August 4, 2004, stating that plaintiff had
approached Tartucci for two separate loans. Defs.' Ex. X.

Defendants also point to an August 2004 investigation
linking plaintiff to missing cash on delivery ("CODs"). Defs.'
Mem. of Law in Supp. of Summ. J. at 8. According to David
Colletti, the accountant for the company's New York office,
$69,705 worth of customer cash and checks were given to plaintiff
on April 21, 2004, but were never deposited by plaintiff into
Empire's bank account. Coletti Aff. ¶ 4, 5; Defs.' Exs. U.
According to Colleti, when he questioned plaintiff about the
missing money, plaintiff told him to wait to report it to
Empire's corporate headquarters until plaintiff could investigate
the situation. Id. On May 11, 2004, plaintiff informed Coletti
that he had some of the money but that $20,617 remained missing
and that Coletti should not report the missing money. Coletti
Aff. ¶ 6; Defs.' Exs. U. In an e-mail dated August 6, 2004 from

---

[11] Plaintiff does not claim that Tartucci discriminated
against him at any point nor is there evidence that defendants
influenced Tartucci to give the handwritten statement regarding
the loans.

Colletti to Brethour Martinez, Colletti listed instances of missing CODs, dating from March 2004 and totaling over $16,000. Defs.' Exs. U and X. Colletti stated in the e-mail that "these CODs were taken by Andre Berry." Id. He further noted that an additional $8,000 was missing but that plaintiff had admitted to taking the money and had not yet returned it. Id.

When Empire began an office-wide investigation regarding the missing money in early August 2004 and plaintiff was asked to be interviewed as part of the investigation, plaintiff requested to tape the interview and to have his attorney review the necessary forms. Pl's Decl. at ¶ 78-80. After plaintiff's requests were denied, the interview did not proceed. Berry Dep. at 341:17-21.

Defendants claim that there were other incidents of misconduct by plaintiff over the course of his employment. For example, defendants allege that at some point during plaintiff's employment, plaintiff had an Empire-hired installation crew put in carpet for his mother in Virginia.[12] Defs.' 56.1 at ¶ 45. According to Brethour Martinez, there was no record of this installation in the computer system, and her internal investigation determined that approximately $6,000 worth of new carpeting was illegally taken from Empire and installed in plaintiff's mother's home. Id.; Defs.' Exs. R and U. Plaintiff, however, states that he appropriately purchased and documented

---

[12] It is unclear when this incident occurred.

the installation of the carpet for his mother.[13]  Pl.'s Decl. at
¶ 100.

As another example of misconduct, defendants claim that when
Empire decided to fire Mott, the New York office manager, due to
performance issues, plaintiff took her out for a drive and
terminated her away from the office instead of doing so in the
workplace as per the company's usual termination practice.
Brethour Martinez Aff. ¶ 9; Jeffers Aff. ¶ 9.[14]  According to
Brethour Martinez and Mark Jeffers, an assistant general manager
at Empire, after terminating Mott, plaintiff allowed her to
return to her desk in the office and to delete important files
from her computer.  Id.  Plaintiff, however, states that he
permitted Mott to return to her desk to gather her personal
belongings and that she merely deleted her personal files.  Pl's
Decl. at  ¶ 35.

Finally, defendants claim that in addition to plaintiff's
questionable actions, his overall performance as General Manager
was lacking from February 2004 to August 2004.  Defs.' 56.1 at
¶ 47.  In an e-mail dated July 21, 2004, Glantz informed
plaintiff that he was not performing on a satisfactory level.
Defs.' Ex. T.  Specifically, Glantz noted plaintiff's attendance
issues, the unsanitary office conditions and incomplete carpet

---

[13] Although plaintiff claims to have documented the payment
for his mother's carpet, he fails to provide any documentary
evidence of such payment.

[14] It is unclear when this incident occurred as well.

installation orders and payments.  Id.  Glantz concluded his
cautionary e-mail to plaintiff by stating, "If I do not get
resolution to the above it will lead to jeopardy of your position
with the company."[15]  Id.  According to Brethour Martinez, she
also spoke to plaintiff regarding his conduct.  Brethour Martinez
Aff. ¶ 15-16.  Because he was not responsive to her, she
complained about plaintiff to Glantz on multiple occasions.  Id.

Brethour Martinez also claims that plaintiff was not present
throughout the majority of his last four weeks of employment at
Empire.  Id. at ¶ 16.  Plaintiff, however, claims that his job
often required him to work in the field and that he was entitled
to vacation time and personal days.  Defs.' Ex. T.; Pl.'s 56.1 at
¶ 50-51.

**(4)**

**The Termination**

On August 18, 2004, plaintiff arrived at his office and was
informed by Glantz that an investigation was being conducted
regarding missing money.  Pl.'s Decl. at ¶ 83.  According to
plaintiff, Glantz then asked him to step outside and told him

---

[15] Plaintiff responded to Glantz's email and informed Glantz
that he had hired a new associate to oversee the office
maintenance.  Defs.' Ex. T.

that he was terminated based on his performance.[16]  Id.

Plaintiff claims that prior to this discussion, he never received a verbal or written warning regarding any deficiencies in his performance.  Id. at ¶ 85-87.  However, as discussed above, in a July 21, 2004 e-mail, Glantz explicitly warned plaintiff about his poor performance and threatened to fire him.  Defs'. Ex. T. Additionally, according to Brethour Martinez, she "counseled Berry about the lack of office maintenance and not being accessible" at some point between February and August 2004. Brethour Martinez Aff. ¶ 15.

## (5)

### Retaliation

#### a. Retaliation Prior to Termination

Plaintiff alleges that while employed at Empire, he was retaliated against because he opposed and questioned defendants'

---

[16] Although defendants provide multiple examples of plaintiff's alleged inappropriate conduct and overall poor work performance, they fail to specifically identify the reason, or reasons, for his termination.  Defendants' motion papers discuss a number of incidents leading up to plaintiff's termination but fail to provide any evidence explicitly stating the exact reason for the termination.  Notably, the record does not include any affidavits or depositions from any decisionmakers identifying the specific reasons for plaintiff's termination.  Additionally, on the Empire "Personnel Action" form documenting plaintiff's termination, there is no reason provided for the termination. Pl.'s Ex. E.  Instead, in the section labeled "Reasons for Termination," the form merely states, "See e-mail."  It is unclear to which e-mail this form refers.

discriminatory practices. Pl.'s Decl. at 41-42, 71, 76, 84.
Specifically, plaintiff alleges that from July 2002 to December
2002, he complained about unfair sales practices targeting
African-Americans and Hispanics, and that as a result, he was not
allowed to control the areas that his salespeople frequented.
Berry Dep. at 198:1-17; Pl.'s Decl. at ¶ 67-71. Similarly, in
late 2003, plaintiff claims that he expressed opposition to the
company's alleged policies against installing carpet in African-
American and Hispanic neighborhoods and targeting minorities for
unfair charges. Pl.'s Decl. at ¶ 67-70. Plaintiff claims that
defendants responded by circumventing him when making decisions
about plaintiff's market and excluding him from relevant
communications. Id. at ¶ 76.

Plaintiff also claims that in 2003, he was excluded from the
hiring of Countryman and Greene in retaliation for his
"complaints about the racist comments, policies and activities
occurring at Empire." Id. at ¶ 41.


**b. Retaliatory Termination**

On August 17, 2004, a day before his termination, plaintiff
filed a discrimination and retaliation charge against Empire with
the New York State Division of Human Rights ("NYSHR")
(hereinafter referred to as "first NYSHR complaint").[17] Defs.'

---

[17] Plaintiff claims that the process of preparing the
discrimination charge, specifically filing the necessary papers
and attending interviews with the Division of Human Rights

Ex. L.  Plaintiff contends that defendants retaliated against him by terminating him in response to the first NYSHR complaint. Pl.'s Decl. at ¶ 84.   Defendants, however, claim that the decision to terminate plaintiff was made prior to Empire becoming aware of the first NYSHR complaint and that plaintiff anticipated his termination.  Defs.' 56.1 at ¶ 33, 66.  Notably, plaintiff's NYSHR complaint was dated August 18, 2004.  Defs.' Ex. M; <u>see also</u> <u>infra</u> note 25 and 26.  Additionally, in an e-mail dated August 5, Brethour Martinez informed Glantz and Silvers that plaintiff had cleared out his desk in anticipation of his termination "because of the mess in New Jersey."[18]  Defs.' Ex. Y.

**c. Post-Termination Retaliation**

Following his termination, plaintiff filed an additional charge of discrimination and retaliation against Empire with the NYSHR on October 13, 2004 ("second NYSHR complaint").  Defs.' Ex. N.  On or about May 16, 2005, plaintiff became aware that Empire was suing him in state court for unjust enrichment, conversion, fraud and breach of contract.  <u>Id.</u>  Plaintiff claims that the lawsuit was retaliatory.  Pl.'s Decl. at ¶ 104.  When he learned that Empire was suing him, plaintiff filed a third complaint with

---

representatives, began three weeks prior to the actual filing date of August 17.  Pl's Decl. at  ¶ 72.

[18] It is unclear what incident Brethour Martinez is referring to.

the NYSHR on May 20, 2005 ("third NYSHR complaint"). Defs.' Ex. N.

**Discussion**

**(1)**

**Race Discrimination**

Title VII prohibits employment-related discrimination on the basis of an individual's race, color, religion, sex or national origin and retaliation against employees who complain about discrimination. 42 U.S.C. §§ 2000e-1 et seq. Employment discrimination cases brought under Title VII are governed by the framework established by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Under the <u>McDonnell Douglas</u> framework, a plaintiff must meet the initial burden of establishing a prima facie case of discrimination. <u>McDonnell Douglas</u>, 411 U.S. at 802. In order to do so, plaintiff must show that: (1) he belongs to a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) that the adverse action occurred in circumstances giving rise to an inference of discriminatory intent. <u>Mathirampuzha v. Potter</u>, 548 F.3d 70, 78 (2d Cir. 2008).

Plaintiff's initial burden is de minimis and is "neither onerous, nor intended to be rigid, mechanized or ritualistic." <u>Abdu-Brisson v. Delta Airlines, Inc.</u>, 239 F.3d 456, 467 (2d Cir.

2001) (internal quotation marks and citations omitted).
Nonetheless, plaintiff's claim must fail if he cannot demonstrate
a prima facie case of discrimination.  <u>Williams v. R.H.
Donnelley, Corp.</u>, 368 F.3d 123, 126 (2d Cir. 2004).  Assuming
plaintiff provides sufficient evidence to establish a prima facie
case, the burden then shifts to defendant to articulate a
legitimate, non-discriminatory reason for the adverse employment
actions at issue.  <u>McDonnell Douglas</u>, 411 U.S. at 802.

Once defendant establishes a non-discriminatory reason, the
burden then shifts back to the plaintiff to present evidence
demonstrating that the defendant's stated reason is a mere
pretext and that the actual motive was discriminatory.  <u>Patterson
v. County of Oneida</u>, 375 F.3d 206, 221 (2d Cir. 2004).
Summary judgment is granted where "plaintiff has failed to show
that there is evidence that would permit a rational fact-finder
to infer that the employer's proffered rationale is pretext."
<u>Id.</u>

Applying the steps of the <u>McDonnell Douglas</u> test to the
instant case, plaintiff fails to meet his initial evidentiary
burden.  As an African-American male, plaintiff satisfies the
first requirement of the test, membership in a protected class.
Plaintiff has met the second requirement, demonstrating that he
was qualified for his position.  Indeed, plaintiff was promoted
five months after beginning his employment with Empire and
received a wage increase in January 2004 based on his performance

19

evaluation.  Defs.' Exs. G and J.  Plaintiff has also made a
showing of an adverse employment action, i.e., his termination,
thereby meeting the third factor of the <u>McDonnell Douglas</u> test.[19]
<u>See</u> <u>Williams</u>, 368 F.3d at 128 (holding that termination of
employment is "sufficiently disadvantageous to constitute an
adverse employment action").

    Plaintiff fails, however, to satisfy the fourth requirement
of the <u>McDonnell Douglas</u> test because his evidence does not give
rise to an inference of discriminatory intent.  First, plaintiff
fails to demonstrate any inference that Glantz and Silvers
discriminated against him.  Under "the same actor inference,"
when a plaintiff is hired and fired by the same manager, it
suggests that invidious discrimination was unlikely.  <u>Grady v.</u>
<u>Affiliated Cent., Inc.</u>, 130 F.3d 553, 560 (2d Cir. 1997) ("[W]hen
the person who made the decision to fire was the same person who
made the decision to hire, it is difficult to impute . . . an
invidious motivation that would be inconsistent with the decision

---

    [19] It is unclear whether plaintiff is claiming that anything
other than his termination qualifies as an adverse action.
However, none of the other incidents he raises, such as his
exclusion from the hiring of Countryman and Greene or his
inability to discipline them, rise to the level of an adverse
action.  <u>See</u> <u>Leibowitz v. Cornell Univ.</u>, 584 F.3d 487, 499 (2d
Cir. 2009) ("An adverse employment action, for purposes of . . .
Title VII, is more disruptive than a mere inconvenience or an
alteration of job responsibilities and can include termination of
employment, a demotion evidenced by a decrease in wage or salary,
a less distinguished title, a material loss of benefits [or]
significantly diminished material responsibilities.") (internal
citations omitted).  As explained below, plaintiff's exclusion
from the hiring of Countryman and Greene does not qualify as an
adverse action even under the more liberal retaliation standard.

to hire."); see also Liburd v. Bronx Lebanon Hosp. Ctr., No. 07-
CV-11316, 2009 WL 900739, at *5 (S.D.N.Y. Apr. 3, 2009) (finding
no inference of discrimination when plaintiff alleged
discrimination by the same supervisor who approved plaintiff's
salary increases on multiple occasions); Figueroa v. New York
City Health and Hosps. Corp., 500 F. Supp. 2d 224, 236 (S.D.N.Y.
2007) (finding no inference of discrimination when plaintiff
alleged discrimination by the same supervisors who approved
plaintiff's promotion).  Because defendants Glantz and Silvers
were responsible for hiring, promoting and firing plaintiff, and
plaintiff admits that they were aware of his race from the start,
there is no inference of discrimination.

It must be noted that plaintiff also relies on the fact that
Glantz was involved in a discriminatory incident against an
African-American employee at Empire.  Pl.'s Mem. of Law in Opp'n
to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") at 9.  On June 2,
2006, Empire's Human Resources Department documented an incident
involving Glantz and Rachel Gregersen ("Gregersen"), an African-
American female employee.  According to the complaint
investigation form, in the midst of a discussion regarding her
wage adjustment increase, Glantz said to Gregersen, "If the South
had won, you wouldn't have even been here."[20]  Pl.'s Ex. D.

---

[20] Although the complaint investigation form was filed on
June 2, 2006, it is unclear when this incident occurred.

Nevertheless, Glantz's statement to Gregersen does not give
rise to an inference of discrimination in the instant case.
When "statements of a person involved in the decisionmaking
process . . . reflect a discriminatory . . . animus," an
inference of discrimination may arise.  <u>Rose v. New York City Bd.
of Educ.</u>, 257 F.3d 156, 161 (2d Cir. 2001) (internal quotation
marks and citations omitted).  However, "the more remote and
oblique the remarks are in relation to the employer's adverse
action, the less they prove that the action was motivated by
discrimination. . . ."  <u>Tomassi v. Insignia Fin. Group, Inc.</u>, 478
F.3d 111, 115 (2d Cir. 2007); <u>see</u> <u>also</u> <u>Gilmore v. Lancer Ins.
Co.</u>, No. 08-cv-0628, 2010 WL 87587, at *10 (E.D.N.Y. Jan. 7,
2010)(noting that comments unrelated to the decisional process
were  insufficient evidence to establish a claim of
discrimination).  Specifically, a comment must be considered in
its overall context, and not "all comments pertaining to a
protected class are . . . equally probative of discrimination."
<u>Tomassi</u>, 478 F.3d at 115.   In determining the probative value
of a comment, "[t]he temporal proximity of the remark to the
adverse employment action may . . . be indicative of
discriminatory intent."  <u>Fiore v. Fairfield Bd. of Educ.</u>, No. 07-
cv-00926, 2009 WL 2869523, at *7 (D. Conn. Sept. 1, 2009); <u>see
also</u> <u>Gilmore</u>, 2010 WL 87587 at *10 (holding that employer's
comment to plaintiff that "men here don't get promoted" did not

give rise to an inference of discrimination because, <u>inter alia</u>, plaintiff was terminated over a year later).

Although Glantz appears to have been a decision-maker in plaintiff's termination, Glantz's remark to Gregersen does not give rise to an inference of discrimination.  Glantz's comment to Gregersen was completely unrelated to the decisional process to terminate plaintiff and was not even made about plaintiff. Indeed, this incident, which occurred almost two years after plaintiff's termination, was not made proximate in time to plaintiff's termination.

Second, plaintiff's evidence regarding Baker's various comments also fails to create an inference of discriminatory intent.  A remark made by an individual who is not involved in the pertinent decision-making process will likely not support a discrimination suit.  <u>Rose v. New York City Bd. of Educ.</u>, 257 F.3d 156, 161 (2d Cir. 2001).  Comments by a non-decision-maker are relevant, however, if the speaker influenced the actual termination decision.  <u>See</u> <u>id.</u> at 162 (holding that there is evidence of discrimination when a discriminatory co-worker lacking formal firing authority nonetheless "had enormous influence in the decision-making process").

Here though, plaintiff brings no evidence that Baker was a decision-maker or that he had any influence on the termination decision.  Moreover, in his affidavit, Baker specifically states that he "was not involved in the decision to terminate Berry nor

was [his] input sought in making such decision."  Baker Aff. ¶ 9.
Baker's various comments, therefore, do not support an inference
of discrimination.  Additionally, plaintiff never argues that
Baker influenced plaintiff's supervisors.  Rather, plaintiff
merely claims that Glantz, Silvers and Smith never addressed
Baker's comment or disciplined him and thereby tacitly approved
of his behavior.  Pl.'s Opp'n at 11.  This alleged failure to
discipline Baker does not create an inference of intentional
discrimination, and plaintiff offers no authority suggesting
otherwise.[21]

Third, plaintiff fails to demonstrate an inference of
discrimination based on Countryman and Greene's behavior,
specifically their alleged undermining of his authority as well
as Countryman's use of the racial slur "moolinyan."  Like Baker,
Countryman and Greene were not in supervisory, decision-making
positions, and there is no evidence that they had any influence
on the termination decision.

Finally, plaintiff points to his exclusion from the hiring
of Countryman and Greene as evidence of discrimination.[22]  Yet,

---

[21] In regard to Baker's comment at the General Manager's
dinner, plaintiff suggests that Brethour Martinez's response
indicated discrimination.  Specifically, as described above,
Brethour Martinez told Baker that "that he cannot have these
conversations . . . especially in front of [plaintiff]."  Pl.'s
Ex. B.  However, Brethour Martinez's response to Baker's comment
clearly indicates her disapproval of Baker's behavior and does
not create an inference of discrimination.

[22] Plaintiff's statement that other general managers in the
region told him that it was Empire's practice to allow general

24

plaintiff fails to explain why, if defendants were indeed excluding him because of his race, they had previously included him in the hiring process. <u>Cf.</u> <u>Duprey v. Prudential Ins. Co. of Am.</u>, 910 F. Supp. 879, 886-87 (N.D.N.Y. 1996) (noting that there was no inference of discrimination when employer retained disabled employee for thirteen months prior to his termination because an employer who intends to discriminate would not hire the disabled person in the first place). Moreover, the fact that plaintiff was excluded from participating in the hiring of Countryman and Greene, which occurred over a year and a half before plaintiff's termination, does not suggest that the termination was discriminatory. A single minor incident of potentially disparate treatment does not necessarily permit the inference that all subsequent adverse actions taken against the plaintiff were discriminatory.

As such, plaintiff fails to bring evidence giving rise to an inference of discriminatory intent, and his claim of race discrimination must therefore fail.[23]

_____

managers to participate in the hiring process, Pl.'s Decl. at ¶ 38, is inadmissible hearsay. Plaintiff's statements that he had previously participated in the hiring of Tom Patrickquin and that he witnessed Brad Freiss participate in the hiring process would, however, be admissible. <u>Id.</u>

[23] Because plaintiff fails to demonstrate an inference of discrimination, it is unnecessary to proceed with the next steps of the <u>McDonnell Douglas</u> analysis. <u>See</u> <u>supra</u> note 16. As such, it is irrelevant that defendants have not proffered a specific reason for plaintiff's termination, and there is no need to address plaintiff's alleged misconduct such as, <u>inter</u> <u>alia</u>, his extortion of Tartucci for loan money, his failure to pay

**(2)**

**Retaliation**

Title VII also prohibits an employer from discriminating against an employee for opposing an unlawful employment practice. 42 U.S.C. §§ 2000e-3(a).  Retaliation claims are analyzed under a three prong burden shifting framework.  <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 768 (2d Cir. 1998).  To establish a prima facie case of retaliation, plaintiff must first show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  <u>Jute v. Hamilton Sundstrand Corp.</u>, 420 F.3d 166, 173 (2d Cir. 2005) (quoting <u>McMenemy v. City of Rochester</u>, 241 F.3d 279, 282-83 (2d Cir. 2001)).

If plaintiff meets his initial burden, then defendant must demonstrate a legitimate, non-retaliatory reason for the adverse employment action.  <u>Id.</u> at 173.  Finally, once defendant meets its burden, plaintiff "must point to evidence that would be sufficient to permit a rational fact-finder to conclude that the employer's explanation is merely a pretext for impermissible

---

salesmen's commissions and to complete installations, his out of office termination of Mott, his refusal to cooperate fully with the office investigation into missing money, his overall attendance problems and his disregard for office conditions. Defs.' Exs. T, U, X; Brethour Martinez Decl. ¶ 14-17, 19.

retaliation." Cifra v. G.E. Co., 252 F.3d 205, 216 (2d Cir.
2001).

Plaintiff alleges that defendants took several retaliatory
actions against him.  However, each of his retaliation claims
fails to meet one or more of the four elements set forth above
required to establish a prima facie case of retaliation.
Plaintiff's first claim, that Empire prohibited him from
disciplining Countryman and Greene because he complained about
the company's discriminatory sales practices, fails because
plaintiff's complaints do not qualify as protected activity.
Plaintiff's second claim, that Empire excluded him from the
hiring of Countryman and Greene because he complained about
Baker's comments, fails because plaintiff's exclusion from the
hiring process does not qualify as an adverse action.  Likewise,
plaintiff's third claim, that Baker contradicted plaintiff's
instructions to the sales managers in the New York office because
plaintiff complained about Baker's comments, also fails because
plaintiff has not shown that these contradictory sales
instructions rise to the level of an adverse action.  Plaintiff's
fourth claim, that Empire terminated him for filing the first
NYSHR complaint, fails because Empire did not have knowledge of
the NYSHR complaint at the time of plaintiff's termination.
Finally, plaintiff's fifth claim, that Empire filed a post-
termination lawsuit against him for filing the second NYSHR
complaint, fails because there was no causal connection between

the two events.  Pl.'s Decl. at ¶ 26, 41, 71, 84, 101, 104.
Thus, summary judgment is granted on plaintiff's retaliation
claims.

**a. Protected Activity**

"Protected activity" refers to an action taken to protest or
oppose statutorily prohibited discrimination.  See 42 U.S.C. §§
2000e-3.  Plaintiff's NYSHR complaints, which reported the
alleged discrimination and retaliation at Empire, qualify as
protected activity.  Similarly, plaintiff's written and verbal
complaints to Human Resources and Empire management regarding
Baker's behavior also qualify as protected activity.  See Cruz v.
Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000)("[T]he law
is clear that opposition to a Title VII violation need not rise
to the level of a formal complaint in order to receive statutory
protection . . . .");  Summer v. U.S. Postal Serv., 899 F.2d 203,
209 (2d Cir. 1990) (holding that protected activities include
"making complaints to management").

However, plaintiff's complaints to management that the
company was discriminating against African-American and Hispanic
customers do not rise to the level of protected activity.
Specifically, the protected activity element is not satisfied
"where the practice complained of was not directed at employees
but, instead, was directed to individuals who are not in an
employment relationship with the defendant."  Taneus v.

Brookhaven Mem'l Hosp. Ctr., 99 F.Supp. 2d 262, 267 (E.D.N.Y. 2000); see also Wimmer v. Suffolk County Police Dept., 176 F.3d 125, 135-36 (2d Cir. 1999) (noting that the purpose of Title VII is the protection of employees from discrimination by their employers, not as a general remedy for an employer's discrimination of private individuals who are not employees). Thus, because Empire's alleged discriminatory sales activity were directed at Empire customers and not Empire employees, plaintiff's complaints do not qualify as protected activity. See, e.g., Ramsey v. Centerpoint Energy/Entex, No. 04-CV-769, 2006 WL 149065, at *3 (S.D. Miss. Jan. 19, 2006) ("[A] Charge of Discrimination based on discriminatory conduct by an employer toward nonemployees [does not] satisf[y] the protected activity element for a claim of retaliatory discharge."); Rossell v. County Bank, No. 05-195-SLR, 2006 WL 777074, at *2 (D. Del. Mar. 27, 2006) (holding that "an employee's efforts to shield her employer's customers from discrimination by the employer is not a protected activity under Title VII") (internal quotation marks omitted). Therefore, plaintiff's claim that Empire retaliated against him for complaining about the company's discriminatory sales practices fails.

## b. Empire's Knowledge of Plaintiff's Protected Activity

Plaintiff must also demonstrate that defendant had knowledge of his protected activity. Plaintiff has demonstrated that

Empire and Baker knew about plaintiff's complaints regarding
Baker's comments.  Specifically, in an e-mail from Brethour
Martinez to management, Brethour Martinez describes plaintiff's
various complaints about Baker made throughout plaintiff's
employment at Empire.  Pl.s' Ex. B.  See Gordon v. N.Y. City Bd.
of Educ., 232 F.3d 111, 116 (2d Cir. 2000) ("Neither this nor any
other circuit has ever held that, to satisfy the knowledge
requirement, anything more is necessary than general corporate
knowledge that the plaintiff has engaged in a protected
activity.").  Similarly, it is undisputed that Empire had
knowledge of the second NYSHR complaint filed by plaintiff in
October 2004 when it filed the lawsuit against plaintiff in May
2005 and knowledge of plaintiff's complaints about the company's
discriminatory sales practices.[24]

     However, plaintiff has failed to show that Empire knew of
the first NYSHR complaint at the time of his termination.
Although plaintiff was terminated on August 18, 2004, a day after
filing his first complaint with the NYSHR, plaintiff provides no
evidence demonstrating that the company had received notice of
the complaint at the time of his termination.  Plaintiff states
that the first NYSHR complaint was served on Brethour Martinez on
August 17, 2004.  Pl.'s Decl. at ¶ 82.  However, the verified
complaint that the NYSHR sent to Empire is dated August 18, 2004.

_____

     [24] Plaintiff claims that he complained to management about
Empire's discriminatory sales practices, and defendants do not
dispute this.  Pl.'s Decl. at ¶ 67-71.

Defs.' Ex. M.  The fact that the verified complaint sent by NYSHR

is dated August 18, 2004 does not, however, answer the question

of when Empire received a copy of the verified complaint.

Rather, that question turns on the method that NYSHR used to send

the verified complaint to the company.[25]  Plaintiff, however,

offers no evidence on this point.[26]

Plaintiff also provides no evidence indicating that anyone

at Empire was aware of his preparations to file the first NYSHR

complaint.  According to plaintiff, his preparations began three

---

[25] In all likelihood, the complaint was sent by regular mail
on August 18 and therefore would not have been received by Empire
until at least August 19.

[26] Plaintiff argues that the "identical" fax transmittal
information on Defs.' Ex. M., which is the first NYSHR complaint
addressed to Empire, and Defs.' Ex. R., an affidavit from
Brethour Martinez in Human Resources, indicates that Empire was
aware of the NYSHR complaint at the time of plaintiff's
termination.  Pl.'s Opp'n at 13.  In specific, plaintiff states:

> The Court should compare the facsimile
> transmittal, dated August 18, 2004 (Empire
> Defendants' Exhibit M) to the marking(s) on Empire
> Defendants' Exhibit R, another document that was
> in the custody of defendants.  A side [sic] from
> the date, both documents are identical, which
> indicates they were sent or were received from the
> same fax machine.  Id.

In addition to the fact that plaintiff's exact argument here
is vague and unclear, the fax transmittal information on Exhibit
M does not actually support plaintiff's position.  From the
evidence provided, it is unclear where and when the Exhibit M fax
originated.  In addition, the fax time stamp on the NYSHR
complaint is August 19, 2004, which only indicates that Empire
had a copy of the complaint in its possession the day *after*
plaintiff's termination.  Moreover, when defendants' lawyers
asked for a clarification regarding plaintiff's claim concerning
the faxes, plaintiff failed to provide any explanation.  See
Defs. Exs. Z and AA.

weeks prior to the actual filing date of August 17.  Pl.'s
Decl. at ¶ 72.  However, even when taken in the light most
favorable to plaintiff, this bare fact is insufficient to
demonstrate that anyone at Empire was aware of the NYSHR
complaint prior to plaintiff's termination.  Thus, plaintiff's
claim that he was terminated in retaliation for filing a NYSHR
complaint on August 17, 2004 also fails.


**c. Adverse Action**

     To demonstrate an adverse action in a retaliation claim, "a
plaintiff must show that a reasonable employee would have found
the challenged action materially adverse, which . . . means it
well might have dissuaded a reasonable worker from making or
supporting a charge of discrimination."  Burlington N. and Santa
Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation
marks and citations omitted).  Under this standard, the post-
termination lawsuit filed by Empire, which plaintiff claims was
retaliatory, certainly qualifies as an adverse action.[27]  See
Gill v. Rinker Materials Corp., No. 02-CV-13, 2003 U.S. Dist.
LEXIS 2986, at *12-13 (E.D. Tenn. Feb. 24, 2003)(denying
defendant's motion to dismiss plaintiff's retaliation claim
because defendant's counterclaim against plaintiff for breach of

_____

     [27] Likewise, plaintiff's termination certainly qualifies as
an adverse action.  However, as established above, plaintiff's
claim that he was terminated in retaliation for filing the first
NYSHR complaint fails on the knowledge element.

contract, unjust enrichment, conversion and spoliation satisfied the adverse employment action element of plaintiff's retaliation claim).

However, the exclusion of plaintiff from the hiring of Countryman and Greene was not "materially adverse." At the time of the hiring of Countryman and Greene, plaintiff had previously participated in the hiring process only once before, even though plaintiff had already worked at Empire for a year. See Pl.'s Decl. at ¶ 38. Thus, participation in the hiring process was not a significant part of plaintiff's duties. Cf. Kessler v. Westchester County Dept. of Soc. Servs., 461 F.3d 199, 209 (2d Cir. 2006) (holding that an employer's decision to prevent plaintiff from attending meetings and overseeing managerial assignments qualified as a materially adverse action because this change represented a significant departure from plaintiff's prior responsibilities).

Moreover, even if plaintiff had been included in the hiring of Countryman and Greene, his influence on the final hiring decision would have been limited as senior management maintained the ultimate authority in hiring sales managers.[28] Pl.'s Ex. F. Thus, plaintiff's exclusion does not qualify as materially adverse since his overall decision-making authority over the

---

[28] Plaintiff has not disputed Glantz's assertions that "it [was] not customary for the General Manager in any region to have exclusive interviewing capability" and that "only Empire's Senior Vice Presidents and Chairman have the final decision making authority." Pl.'s Ex. F.

hiring process was limited.  As such, plaintiff's claim that he was retaliated against by management in response to his complaints about Baker also fails.

Baker's alleged discriminatory instructions to the sales managers in the New York office also do not qualify as an adverse action because it is unclear from the record what effect, if any, these sales instructions had on plaintiff.  Additionally, plaintiff provides no evidence of these alleged discriminatory sales instructions, absent his own conclusory statements, which are devoid of any specific details.  In fact, the record suggests that Baker explicitly encouraged increasing sales in the inner city neighborhoods.[29]  Defs.' Ex. H.  Therefore, plaintiff's claim that he was retaliated against by Baker in response to his complaints about Baker also fails.

**d. Causal Connection**

Plaintiff's only remaining claim is that Empire filed a lawsuit against him in response to the second NYSHR complaint. However, this claim fails as well since plaintiff has not

---

[29] Notably, in an e-mail from Baker to general managers, sales managers, Glantz and Silvers,

[T]urndowns are from the inner city . . . . When your people get a turn down train them hard to go down . . . . I know it can be done.  I do it every day . . . . Make sure they get a decent down payment . . . . Make sure your sales force is working every lead like it was there last one.  Defs.' Ex. H.

demonstrated a causal connection between this complaint and Empire's lawsuit.

To establish the causal connection necessary for a retaliation claim to succeed, a plaintiff must show that the employer's adverse action was a direct or indirect result of his protected actions. Reed v. A.W. Lawrence & Co., Inc. 95 F.3d 1170, 1178 (2d Cir. 1996) ("[T]he causal connection . . . . can be established . . . . by showing that the protected activity was closely followed in time by the adverse action.") (internal quotation marks omitted). Although there is no bright-line test defining the time period necessary to demonstrate a causal connection, courts generally require that the events be very close in time. Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir. 2001).

Empire did not file the lawsuit against plaintiff until approximately May 2005, approximately seven months after plaintiff filed his second NYSHR complaint in October 2004. Given this lapse of time, plaintiff has failed to demonstrate a causal connection. See, e.g., Garrett v. Garden City Hotel, No. 05-CV-0962, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) ("[D]istrict courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation."); Murray v. Visiting Nurse Servs. of N.Y., 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (same); Nicastro v. Runyon, 60

F.Supp. 2d 181, 185 (S.D.N.Y. 1999) ("Claims of retaliation are
routinely dismissed when as few as three months elapse between
the protected . . . activity and the alleged act of
retaliation."); see also Clark County Sch. Dist. v. Breeden, 532
U.S. 268, 273-74 (2001) (approving Seventh and Tenth Circuit
cases that found a three month and a four month period
insufficient to establish the temporal proximity required to show
causality).[30] Similarly, there was no temporal proximity between
plaintiff's complaints about Baker in January 2002 and Baker's
alleged sales instructions in December 2002.[31]

In sum, plaintiff fails to demonstrate a prima facie case of
retaliation. As such, summary judgment is granted on plaintiff's
retaliation claims.

---

[30] Even assuming arguendo that a causal connection existed
between plaintiff's second NYSHR complaint and Empire's lawsuit,
defendants have demonstrated a legitimate nondiscriminatory
reason for filing the lawsuit. Although defendants do not
explicitly state the reason for their lawsuit, it is apparent
from the nature of their claims– i.e., that plaintiff is liable
for unjust enrichment, conversion, fraud and breach of contract.
Moreover, plaintiff has made no effort to show that this reason
is pretextual. In fact, plaintiff does not dispute that he was
being investigated as a suspect in an office-wide investigation
for missing money. Pl.'s Decl. at ¶ 77-78. Thus, plaintiff
fails to demonstrate that Empire's lawsuit was retaliatory even
under a complete application of the McDonnell Douglas framework.

[31] On the other hand, plaintiff's other retaliation claims
meet the causal connection requirement. However, because they
fail on the grounds described above, it is unnecessary to explore
this further.

**(3)**

**Section 1981**

"The elements required to make out a claim of retaliatory discharge under 42 U.S.C. § 1981 are the same as those required to make out such a claim under Title VII." <u>Taitt v. Chem. Bank</u>, 849 F.2d 775, 777 (2d Cir. 1988). Because summary judgment is being granted on plaintiff's Title VII claim, summary judgment is also warranted on his Section 1981 claim.

**(4)**

**State Law Claims**

If a district court dismisses all claims over which it has original jurisdiction, it may in its discretion decline to exercise supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3); <u>Tops Markets, Inc. v. Quality Markets, Inc.</u>, 142 F.3d 90, 102-03 (2d Cir. 1998). Plaintiff's claims for breach of contract, intentional infliction of emotional distress and violations of NYSHRL all arise under state law. Consequently, because plaintiff's Title VII and Section 1981 claims do not survive summary judgment, these state law claims are dismissed without prejudice. Defendants' counterclaims for unjust enrichment, conversion and fraud are also dismissed without prejudice.

## Conclusion

For the foregoing reasons, defendants' motions for summary judgment are granted and all of plaintiff's federal claims are dismissed with prejudice. Plaintiff's state law claims are dismissed without prejudice. The Clerk of the Court is directed to close this case.


Dated: Brooklyn, New York
       March 18, 2010

                              SO ORDERED:


                              _____/s/_____
                              David G. Trager
                              United States District Judge